**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 12-34152 |
| DANIEL THOMAS HENRY and | ) | Chapter 7 |
| MARGARET JEAN HENRY | ) | |
| | ) | |
| Debtors. | ) | |
| ______________________________ | ) | |
| CAROLYN A. VENDRAMIN, | ) | |
| | ) | Adv. Proc. No. 13-03061 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL THOMAS HENRY and | ) | |
| MARGARET JEAN HENRY | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' POST-TRIAL BRIEF**

---

In accordance with this Court's instructions from the bench at the conclusion of trial on January 22, 2015, Defendants submit the following Post-Trial Brief:

**LEGAL STANDARD**

Plaintiff seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(4) and (a)(6). Exceptions to discharge are narrowly construed in favor of the debtor. *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992). The creditor bears the burden of proving that her debt falls within a particular exception by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (2009).

## EVIDENCE PRESENTED AT TRIAL

The relevant evidence presented at trial demonstrates that Plaintiff Carolyn Vendramin and Defendant Dan Henry incorporated Henry/Cap Construction, Inc. (the "Company") in 2001. The Company engaged exclusively in commercial construction and employed union laborers.

Both Dan Henry and Plaintiff were employed by the Company. Dan Henry handled project management, estimating, and served as the Company's president. Despite having no background in accounting and bookkeeping, Plaintiff served the Company in a bookkeeping capacity. Given her lack of experience, the plan was always to move Plaintiff out of her bookkeeping function once the company had enough income to hire a full time bookkeeper.

The Company was successful for a period of time; however, it operated on small margins which left little room for error. In 2008, the Company began experiencing issues with getting paid from several larger jobs. To address cash flow issues, the Company bid out, and was awarded, several jobs in close geographic proximity to each other. The projected margin on these jobs was even smaller than normal but, given the geographic proximity, the Company determined that it could manage all jobs and make a profit. Unfortunately, the jobs were not profitable and the Company sustained losses. In total, the Company sustained losses of several hundred thousand dollars in 2008.

Not willing to give up on the Company Dan Henry began personally pouring money into the Company to keep it afloat in 2008. Most of the money Dan Henry loaned to the Company came from his retirement accounts. Similarly, Dan Henry began borrowing money from his father to assist with the finances of the Company. Plaintiff did not contribute any additional capital. Dan Henry felt the Company was a couple large jobs away from once again turning solvent. The jobs on the horizon never panned out.

By the time the Company ceased doing business in 2011, the Company owed Dan Henry over $197,000 in funds that Dan Henry had loaned to the Company to keep it afloat. This figure does not represent the additional tax consequences Dan Henry had incurred by virtue of taking early distributions of his retirement savings. At the time it ceased doing business, the Company was also in default to its primary lender, PNC Bank. The Company had significant obligations to various union funds and professionals and had several dozen trade creditors.

During opening arguments, Plaintiff indicated she would advance four factual theories at trial: (1) Defendant Dan Henry embezzled funds belonging to the Company through the use of Company credit cards; (2) the Company paid certain auto insurance on behalf of Dan Henry and his family; (3) Defendant Dan Henry usurped corporate opportunities of the Company; and (4) Dan Henry engaged in a scheme to "freeze out" Plaintiff as a shareholder of the Company.[1] The facts for each of these theories is presented, in turn.

**NO EVIDENCE WAS PRESENTED CONCERNING DAN HENRY'S USE OF THE COMPANY CREDIT CARD FOR PERSONAL EXPENSES**

Plaintiff did not present any evidence concerning Dan Henry's use of the Company's credit cards for personal expenditures. During the direct examination of Plaintiff (and then again on re-direct examination) exhibits H, I, J (and H-1, I-1, and J-1) were admitted into evidence. While these credit card statements purport to show certain expenditures made by various employees of the Company, including Dan Henry, no evidence was presented to demonstrate any of the charges were unauthorized or personal in nature. Plaintiff herself acknowledged that certain charges for which she did not have a receipt could have been work related and not personal in nature.

[1] There was also some discussion during the testimony of the Laborer's Fund representative of supposed fraudulent transfers; however, no evidence or argument on such alleged fraudulent transfers was presented.

Plaintiff testified she was responsible for keeping and maintaining the Company's accounting books and records. In 2007, Plaintiff testified that she felt that Dan Henry had made certain personal expenditures on the Company's credit card and there was a discussion as to how to book these expenses. (Plaintiff's Exhibit 97/CC). From her testimony, it appears that Plaintiff considered any charge made by Dan Henry for which Dan Henry did not turn in a receipt was a "personal charge." Testimony indicated that the two shareholders talked about the lack of receipts as it related to certain expenses in early 2008 for the 2007 year-end review. In an e-mail dated April 3, 2008 (see Plaintiff's Exhibit 97/CC, Bates-Stamp 00272), Plaintiff indicated that the issue had been resolved by including a payable owed to the Company by Dan Henry of $5,000. This payable charge is reflected on page 4 of Defendant's Exhibit 1. Accordingly, to the extent there was an issue, it appears Plaintiff resolved it to her satisfaction. No evidence to the contrary was presented.

Moreover, as set forth in Exhibit 11 through 12, 14 and 15, Dan Henry paid the Company all balances that were booked payable to the Company by Dan Henry. In fact, Dan Henry poured hundreds of thousands of dollars into the Company, even going so far as to cash out his 401(k). He literally gave everything he had to the Company and was the individual most harmed when it failed.

**NO EVIDENCE WAS PRESENTED CONCERNING ANY PAYMENTS FOR INSURANCE FOR PERSONAL AUTOMOBILES**

During opening arguments, counsel for Plaintiff indicated that he intended to prove that Dan Henry had used Company automobiles for personal use. However, the only evidence presented at trial on the topic was Dan Henry's testimony that he owned certain vehicles personally. While there was some discussion concerning whether personal vehicles were insured through the Company's insurance, there was absolutely no evidence presented regarding: (1) the

amount of any payments that may have been made by the Company; (2) whether such payments were authorized; or (3) to the extent such payments were made by the Company, whether such payments were included in Dan Henry's payable back to the Company or otherwise accounted for.

## NO EVIDENCE WAS PRESENTED CONCERNING THE ALLEGED USURPING OF CORPORATE OPPORTUNITIES[2]

Again, during opening arguments, counsel for Plaintiff indicated he intended to prove that Dan Henry had usurped corporate opportunities from the Company. During the direct examination of Jean Henry and again on the cross examination of Dan Henry, counsel for Plaintiff inquired as to a d/b/a of Dan Henry known as "Henry Enterprises." Testimony indicated that it was a d/b/a established to handle smaller scale construction projects utilizing non-union laborers—jobs the Company could not do. No evidence was presented that Dan Henry and/or Henry Enterprises usurped a corporate opportunity nor was any evidence presented as to the value of any such alleged usurped opportunity.

## PLAINTIFF'S EVIDENCE CONCERNING AN ALLEGED FREEZE-OUT WAS VAGUE AND UNCONVINCING

During her direct examination, Plaintiff testified that, in August 2008, Dan Henry approached her and asked her to review the resume of an accountant that he was considering hiring part-time for the Company. On August 26, 2008, Dan Henry came to Plaintiff's office to discuss a fine that had been levied against the Company by the Bricklayer's union. He further indicated that he had hired the part-time accountant to assist with bookkeeping. In response, Plaintiff took some of her belongings and left the office. She never returned.

[2] It appears Plaintiff's theory is that an usurpation of a business opportunity is nondischargeable under 523(a)(4). However, even if the Plaintiff had presented evidence of such usurped corporate opportunities, such opportunities would not constitute property subject to embezzlement or defalcation. *See Weidle Corp. v. Leist*, 398 BR 595, 602-603 (Bankr.S.D.Ohio 2001).

The evidence demonstrates that, after Plaintiff left, Dan Henry made several efforts to communicate with her. Plaintiff acknowledged receiving, but not responding to, a series of e-mails set forth in Defendants' Exhibit 21. Plaintiff further acknowledged not answering the door when Dan Henry visited her residence to discuss matters on August 28, 2008. After not receiving any response to efforts to talk through matters with Plaintiff, and after Plaintiff did not return to work, Plaintiff's at-will employment was terminated by letter dated September 2, 2008.

No evidence was presented to suggest that Plaintiff was squeezed out of her ownership interest in the Company. In fact, the evidence presented at trial demonstrates that she remained a shareholder of the Company. She remained a director of the Company. And she received notices, or at least one notice, from the Company regarding a corporate meeting after she left employment. She was not excluded from discussing the Company or its management; as Plaintiff herself acknowledged, she never requested to assist in the governance of the Company after she separated from employment. The evidence presented indicated only Plaintiff excluded herself from the management and affairs of the Company.

**NO EVIDENCE WAS PRESENTED TO EXPLAIN WHY JEAN HENRY WAS EVEN MADE A PARTY TO THESE PROCEEDINGS**

Last, while Margaret Jean ("Jean") Henry was named a party Defendant to this adversary proceeding, no evidence was presented at trial as to any actions committed by her. Her testimony made clear that, beyond providing some minor assistance of the Company from time to time (for which she was not paid), she had no involvement with the affairs of the Company. To the extent there is a dispute among the parties to this litigation, it is between Dan Henry and Plaintiff.

## ARGUMENT

Through her Complaint (as pared down by the parties' Joint Pre-Trial Order) Plaintiff seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(4) and 523(a)(6). Both the facts and the law fail Plaintiff's allegations and contentions. Below, Defendants will first address the issues of standing and lack of damages before addressing the (a)(4) and (a)(6) claims.

### A. Plaintiff's claim seeks recovery for Company's alleged damages. Her claims are derivative in nature and she lacks standing to pursue such claims individually.

Plaintiff's Complaint seeks redress for wrongs allegedly committed by Dan Henry against the Company. The claims are derivative in nature. While Indiana permits shareholders in a closely held corporation to pursue each other directly under certain conditions, those conditions are not present. Accordingly, Defendants are entitled to judgment in their favor.

The well-established rule in Indiana is that "shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury." *Barth v. Bath*, 659 N.E.2d 559, 560 (Ind. 1995) (citations omitted). One of the reasons for the rule is "the protection of corporate creditors by putting the proceeds of the recovery back in the corporation." *Id.* at 561. A shareholder receives "adequate compensation" by an increase of the value of the shares owned when recovery is "put back into the corporation." *Id.*

In the case of closely held corporations, Indiana has carved out an exception to the general rule that a shareholder may only pursue claims of wrong to a corporation through a derivative action in the name of and for the benefit of a corporation. Specifically, the Indiana Supreme Court has stated:

> In the case of a closely held corporation, the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to a derivative action, and

> order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions; (ii) materially prejudice the interests of creditors of the corporation; or (iii) interfere with a fair distribution of the recovery among all interest persons.

*Barth*, 659 N.E.2d at 562. The *Barth* court cautioned, however, that the exception does not abrogate and general rule requiring derivative actons and explained further:

> However, it is important to keep in mind that the principles which gave rise to the rule requiring derivative actions will sometimes be present even in litigation involving closely-held corporations. For example, because a corporate recovery in a derivative action will benefit creditors while a direct recovery by a shareholder will not, the protection of creditors principle could well be implicated in a shareholder suit against a closely-held corporation with debt.

*Id.* Accordingly, allowing a direct lawsuit between shareholders of a closely held corporation is not appropriate where a shareholder would stand to benefit to the detriment of the corporation's creditors.

The Indiana Court of Appeals further discussed the need to protect creditors of a closely held corporation in *Hubbard v. Tomlinson*, 747 N.E.2d 69 (Ind.Ct.App. 2001). In *Hubbard*, a plaintiff-shareholder sought damages directly from defendant-shareholder. The court found that the underlying corporation had no fewer than 50 creditors. With that in mind, the Court noted that allowing a direct action and direct recovery, bypassing the corporation, would "fail to protect its creditors from loss and its shareholders from prejudice." *Id.* at 72. Based on this finding, the Court of Appeals reversed the trial court's denial of the defendant's motion for summary judgment.

Through her Complaint and again in her pre-trial Order, Plaintiff acknowledges that the harm she complains of caused injury to the Company and its creditors (see, e.g., Pre-Trial Order, Doc 40, p.2 "That these acts caused [Plaintiff] financial injury, as these funds could have been used to pay her interest in the Company as well as other creditors."). In their Answer and

Affirmative Defenses, Defendants asserted that Plaintiff's claims were derivative in nature and that she had failed to sue in the name of the Company and satisfy the requirements of FRCP 23.1 (as made applicable by Fed.R.Bankr.P. 7023.1). Despite notice of this defense, Plaintiff never cured her defective Complaint and pursued her claims derivatively.

The evidence presented at trial demonstrates the Company had several dozen trade creditors at the time it ceased doing business. It owed substantial professional fees and was in default on its obligations to its primary lender, PNC Bank. One need only review the list of unsecured creditors contained in Defendants' Bankruptcy schedules (admitted into evidence as Plaintiff's Exhibit F) to see the veritable "who's who" of the Company's creditors, for many of which Dan Henry had personally guaranteed the Company's indebtedness. If Defendants in fact embezzled money or committed defalcation, they did so to the detriment of all creditors of the Company. Through this action, Plaintiff, a shareholder, attempts to leap frog all creditors and jump to the front of the priority line. *Barth* and *Hubbard* do not allow this.

Despite having notice of her defective pleading from the time Defendants filed their Answer and Affirmative Defenses on October 24, 2013, Plaintiff has never taken any steps to cure her deficiencies and reframe her Complaint into a derivative action. Accordingly, Plaintiff lacks standing and judgment in favor of Defendants is appropriate.

**B. Plaintiff failed to present any evidence from which the Court may make a determination of damages. Accordingly, even if she could claim actions which could support a finding of nondischargeability under 11 U.S.C. 523, the court has nothing upon which it may quantify damages.**

In addition to lacking standing (discussed above) and failing to present evidence of any wrong-doing (discussed below), Plaintiff presented no evidence from which a determination of damages could be made. Under Indiana law, "[d]amages are ordinarily the proper remedy for a shareholder aggrieved by breach of director duty." *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d

227, 243 (Ind. 2001). Here, such damages would likely be any alleged diminution in share value as a result of Defendants' actions. Plaintiff's failure to offer any evidence of damages is fatal to her claims and judgment in favor of the Defendants is appropriate on that basis alone.

From her contentions contained in the Pre-Trial Order (Doc. 40, p. 4), Defendants anticipate Plaintiff may argue that her damages include the obligation of Dan Henry to "pay to the minority shareholder the buy in of the shares at the fair value." Even supposing that such a remedy would be available to the Plaintiff for her claims, Indiana has long held that "when the parties are silent as to the method used for determining the price of stock", "fair market value is the appropriate method of valuing stock." *Shriner v. Sheehan*, 773 N.E.2d 833, 843 (Ind.Ct.App. 2002). No evidence was presented as to the fair market value of Plaintiff's stock. The only evidence presented would seem to indicate Plaintiff's stock had little to no fair market value at the time of her termination but this Court would be left to speculate and engage in conjecture in order to set such a value.

Plaintiff may argue that fair market value is not controlling and that a method described in the Shareholder Buy/Sell Agreement is an appropriate method for valuing her shares of stock. Under the Buy/Sell Agreement (Plaintiff's Exhibit B), the parties agreed to a method for valuation only in certain situations, namely: (1) death, disability, or retirement (See p. 7, Section 7); (2) exercise of the Company's option to purchase shares upon a shareholder's receipt of a bona fide offer (See pp. 3-4, Section 5.1); (3) exercise of Company's option to purchase shares in the event of an involuntary transfer (See pp 6-7, Section 5.3); or (4) exercise of Company's option to purchase shares in the event of the termination of a shareholder's employment (See pp. 7-8, Section 5.4). However, no method was agreed upon for the determination of the value of the Company's shares generally.

At trial, Plaintiff acknowledged: (1) she was not disabled; (2) she had not retired; (3) she was alive; and (4) that the Company had not exercised any option to purchase her shares of stock (such option not being mandatory under Section 5.3). Accordingly, while the Buy/Sell Agreement sets an Agreed Value under certain conditions, those conditions are not present here and the Plaintiff, to the extent she is entitled to an award of the fair value of her shares, is required to present evidence of such value.

Continuing the theme of lacking evidence, even if the "Agreed Value" of Section 7 of the Buy/Sell Agreement somehow controlled any determination of the value of Plaintiff's shares, and even if she was entitled to such value, the Court was not presented with evidence sufficient to make such a determination. Under Section 7, if there is no operative Certificate of Agreed Value dated from within 3 years of the relevant date of determination, the value of the Corporation (for purposes of valuing the Company's shares in the specific situations referenced above) is 1% "of the gross value of work in progress, which consists of the sum of the balance owing on existing contracts being performed, but that are not yet completed and contracts in existence that have not yet commenced."

The only Certificate of Agreed Value was dated January 30, 2002 and, by virtue of its stale date, is not operative under Section 7. Plaintiff submitted no evidence from which the Court can make a determination of 1% of the gross value of work in progress at the time of Plaintiff's termination of employment. Exhibits Y and Z were admitted as business records but not discussed or explained at trial. Those exhibits purport to provide statements of "contracts in progress" as of year-end 2006 and 2007 but are certainly not relevant to the determination of the gross value of work in progress at the time Plaintiff separated from the Company's employment

(September 2, 2008). Accordingly, the Court was provided with no evidence from which to fix any damages.

In sum, Defendants believe Plaintiff's measure of damages, if any, would be the actual amount money damages sustained by Plaintiff as a result of the alleged wrongful actions of Defendants. Plaintiff failed to present any such evidence. To the extent Plaintiff believes she is entitled to an award of the fair value of her shares (which is not supported by law), Plaintiff failed to prove fair market value of such shares. Even if Plaintiff were entitled to an award of damages based upon the "Agreed Value" stated in Section 7 of the Buy/Sell Agreement (presumably measured at the time her employment with the Company ended, September 2, 2008), she has presented no evidence to the Court from which a determination of her value of shares can be measured. Accordingly, the Court has been presented with no evidence from which to make a determination of damages and judgment in favor of the Defendants is appropriate.

**C. Defendants did not commit fraud or defalcation while acting in a fiduciary capacity.**

11 U.S.C. § 523(a)(4) excepts from discharge any debt arising out of "fraud" or "defalcation while acting in a fiduciary capacity." Proving defalcation requires a showing of wrongful intent. *Bullock v. BankChampaign*, 133 S.Ct. 1754 (2013). Moreover, in the Seventh Circuit, it is given a "narrow interpretation." *Hunt v. Hunt*, 439 B.R. 690, 693 (Bankr.N.D.Ind. 2010). A mere negligent breach of a fiduciary duty is not enough—it requires a knowing, willful or reckless breach of fiduciary duties. *Id.*

Plaintiff's contentions contained in the Pre-Trial Order relevant to the claim of defalcation or fraud contend, vaguely, that Dan Henry instructed the Company's CPAs to record

false information in the Company financials to "cover up their embezzlement." Such evidence was not presented at trial. On the contrary, Greg Jurgonski, the Company's CPA, testified that he always found the books of the Company in good order and, when there was an issue between the shareholders on the booking of expenses in 2007, he instructed the shareholders to work the situation out on their own. The situation was resolved.

Without identifying any specific purchases or amounts, Plaintiff testified only that she believed Dan Henry was using the corporate credit card for personal expenses. The evidence presented indicates, however, that Dan Henry had an "account payable" to the Company. When Dan Henry failed to turn in a receipt substantiating a purchase, Plaintiff, who handled the corporate record keeping for the Company, would include it in Dan Henry's account payable. The account payable was paid, in full, by Dan Henry. Plaintiff failed to make any showing of defalcation, fraud, or wrongful intent on the part of either Defendant.

**D. Defendants did not embezzle money from the Company.**

For purposes of 523(a)(4), embezzlement and larceny are defined by federal common law. *Valentine v. Valentine*, 104 B.R. 67, 70 (Bankr.S.D.Ind. 1988). In the Seventh Circuit, larceny is proven if it is shown that the debtor wrongfully and with fraudulent intent took property from its owner. *In the Matter of Rose*, 934 F.2d 901, 902 (7th Cir. 1991). Bankruptcy courts have taken the position larceny requires felonious intent exist at the time of the taking. *See, e.g. In re Hoffman*, 70 B.R. 155, 161 (Bankr.W.D.Ark. 1986). Embezzlement differs from larceny in that in embezzlement the original possession of, or exercise of control over, property is lawful – i.e., the property came into the hands of the debtor lawfully, as by consent. *In re Rose*, 934 F.2d 901, 903 (7th Cir. 1991). Embezzlement is, thus, the "fraudulent appropriation of

property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895).

Plaintiff presented no evidence whatsoever that either Defendant stole or embezzled any money belonging to Plaintiff. The only evidence presented was speculation and conjecture on the part of the Plaintiff that Defendants utilized *Company* funds for personal purposes (purchases made on credit cards and alleged car insurance payments) and usurped *Company* opportunities (though no evidence was presented to support this allegation). Even supposing Company's funds actually belonged to Plaintiff, no evidence was presented of any fraudulent appropriation of such property. The only evidence presented was that Defendants *may have* utilized the Company credit card for personal purchases. But no evidence was presented as to what purchases may have been personal in nature and no evidence was presented that such purchases were not authorized.

In actuality, the evidence demonstrates that the Company's monthly credit card statements were provided to the *Plaintiff* and it was *Plaintiff's* responsibility to properly account for such purchases. Greg Jurgonski, the Company's CPA from 2001 through 2007, testified that if a shareholder utilized a corporate credit card for personal expenses, the Company could either include such personal expenses as income to the shareholder or it could book the personal expenses as a payable due from the shareholder to the Corporation. Plaintiff set up and maintained the books of the Company and elected to treat such alleged personal expenses as a payable due from shareholder.

Moreover, the evidence presented at trial demonstrates that Dan Henry infused several hundred thousand dollars of personal and family money into the Company to keep it afloat between 2008 and 2011. By the time the Company ceased doing business, it owed Dan Henry

close to $200,000. Accordingly, Dan Henry paid back any personal obligations to the Company several times over. As such, Defendants are entitled to judgment in their favor on Plaintiff's Complaint.

**E. Plaintiff failed to provide any evidence that either Defendant owe her a debt for a "willful and malicious injury" caused to Plaintiff or her property.**

A debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable. 11 U.S.C. § 523(a)(6). The Seventh Circuit Court of Appeals has noted, "courts are all over the lot in defining" willful and malicious in section 523(a)(6) but the different definitions "probably don't generate different outcomes." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322-23 (7th Cir. 2012). Generally, a willful and malicious injury "is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Id.* At 324. "[T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself." *Kawaauhau v. Geiger*, 523 U.S. 57-61-62, (1998).

Though not entirely clear from the evidence brought out at trial, it appears Plaintiff argues she was terminated and "frozen out" of the Company and classifies such "freeze out" as a malicious and willful injury. First, it is important to note that Indiana remains an at-will employment state. *See, e.g., W & W Equipment Co. v. Mink*, 568 N.E.2d 564, 574 (Ind.Ct.App. 1991) ("As a general rule, employment relationships in Indiana are terminable at the will of either party.").

Perhaps understanding that a mere claim for termination of an at-will employment relationship is not actionable in Indiana, and certainly not susceptible to a claim of

nondischargeability under 523(a)(6), Plaintiff has latched on to the concept that she was "frozen out" of the Company. The Indiana Supreme Court has defined a freeze-out as the use of corporate control vested in the statutory majority of shareholders or the board of directors to eliminate minority shareholders from the enterprise or reduce their voting power or claims on corporate assets to relative insignificance. *Gabhart v. Gabhart*, 370 N.E.2d 345, 353 (Ind. 1977) (*overruled on other grounds*). A freeze-out implies a *purpose* to force upon the minority shareholder a change which is not incident to any other corporate business goal. *Id*. (emphasis in original)

The actual evidence presented at trial does not support the allegation that Plaintiff was frozen out. The evidence demonstrates only:

(1) Plaintiff was employed by Henry/Cap Construction, Inc. from 2001 until August 2008;

(2) Plaintiff's employment was "at-will" and she had no employment agreement;

(3) In August 2008, the parties had a disagreement over hiring a part-time accountant and an issue surrounding a fine levied against the Company by the Bricklayer's union;

(4) Dan Henry informed Plaintiff that he had hired a part-time accountant;

(5) Plaintiff was upset by this decision, left the office with some of her belongings, and never returned;

(6) Despite Dan Henry's attempts to work things out and communicate with Plaintiff (including the e-mails contained in Plaintiff's Exhibit 21 which were ignored by Plaintiff), Plaintiff never returned to the office and did not respond to Dan Henry's efforts at communication. Plaintiff went so far as to refuse to answer her door when Dan Henry attempted to discuss matters with her in person;

(7) After she failed to return to the office or communicate with Dan Henry, Plaintiff's employment was [understandably] terminated on September 2, 2008;

(8) After her employment was terminated, Plaintiff never requested to be involved in any of the decision-making of the Company; rather, she made a demand for her shares to be purchased (which was not accepted) and initiated a lawsuit against Henry/Cap and Defendants. Thereafter, the two shareholders only communicated through counsel;

(9) Plaintiff remained a full shareholder and a member of the Company's Board of Directors after her termination. No efforts were taken to eliminate her ownership of the Company or to reduce her voting power or claims on corporate assets. Plaintiff recalls receiving at least one notice relating to Company management after her termination.

Supposing a "freeze-out" could be considered a willful injury rising to the level of nondischargeable, the facts simply do not demonstrate that Dan Henry intentionally caused Plaintiff injury. Judgment in favor of the Defendants is appropriate.

## CONCLUSION

Accordingly, Defendants request entry of judgment in their favor and against the Plaintiff on Plaintiff's Complaint.

/s/ Trevor Q. Gasper
Trevor Q. Gasper (26368-71)
Attorney for Defendants

**MAY • OBERFELL • LORBER**
4100 Edison Lakes Parkway, Suite 100
Mishawaka, IN 46545
Telephone: (574) 243-4100
Facsimile: (574) 232-9789

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: Blake N. Dahl, Esq., Gordon Etzler, Esq., Gary D. Boyn, Esq. and Nancy J. Gargula, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: N/A.

/s/ Trevor Q. Gasper