UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| IN RE: )<br>)<br>DANIEL THOMAS HENRY and )<br>MARGARET JEAN HENRY )<br>)<br>    Debtors. )<br>_____) | Case No. 12-34152<br>Chapter 7 |
| CAROLYN A. VENDRAMIN, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>DANIEL THOMAS HENRY and )<br>MARGARET JEAN HENRY )<br>)<br>    Defendant. ) | Adv. Proc. No. 13-03061 |

## **PLAINTIFF'S RESPONSE TO DEFENDANT'S POST TRIAL BRIEF**

Carolyn Vendramin, (hereinafter referred to as "Carolyn"), Daniel Henry (hereinafter referred to as "Henry") and Henry-CAP Construction, Inc. (hereinafter referred to as "Henry-CAP")

The idea to go into the public and private construction business was formulated by Carolyn and Daniel while employed at an established construction company in South Bend IN. Both were graduates of Purdue University and decided the time was right for both to join together to form an operating construction company. On or about the 15th of September 2001 Carolyn and Daniel met at the office of Attorney of Jeffery Johnson whom Daniel was acquainted with through his father, who owned a well-known construction company in South Bend. It was agreed that Carolyn and Daniel would be the sole shareholders and company officers with Carolyn in charge of the accounting and front office work and Daniel in charge of

1

the field operations. It was further agreed that Daniel would contribute sixty six thousand dollars ($66,000) for two thirds (2/3) ownership and Carolyn would contribute thirty three thousand dollars ($33,000) for one third (1/3) ownership with shares issued in that proportion. It was agreed that Attorney Johnson would form the company and provide the necessary legal documentation. The documents were signed in Attorney Johnson's office in the presence of Daniel and Carolyn during December of 2001 and January of 2002. All documents were retained in Attorney Johnson's office.

Unbeknownst to Carolyn, months before, Attorney Johnson, had, filed Articles of Incorporation for Henry/Cap Inc. with the Secretary of State's Office and the corporate entity was formed by Certificate of Organization issued by the Secretary of State's Office on the 17th day of September 2001 without Carolyn's knowledge. Daniel's wife Jean Henry was made a third member of the Board of Directors with Carolyn and Daniel. Jean was made Secretary of the corporation. Daniel was named President and Carolyn was name Vice President. Jean Henry has no training in business of construction receiving her degree in social work and working as a counselor at Ivy Tech. Jean never held a position in a business enterprise and never participated in the business, financial or operational affairs of Henry-CAP. There were never any formal meetings of the Board of Directors or of the shareholders. Jean signed documents when asked. There were no minutes maintained or kept by Henry-CAP. Henry-CAP as a company issued credit cards to Daniel, Carolyn and to other select employees but were limited for only business purposes of the company.

Carolyn in her area of responsibility in accounting and office management maintained the financial books and records on the company's computer. With a book keeper and other staff she maintained all books and records and operated the office. One of her functions was to interact

with the accounting firm of Jurgonski and Fredlake who was the corporate certified public accountants. The accountants reviewed and commented on financial statements prepared by and under the direction of Carolyn. The firm also provided consulting services at the request of Carolyn and of Daniel. The firm also was required to review the accounting practices and books of Henry-CAP and issue annually a "statement of review". The accounting firm's principal partner in charge of the accounting was Gregory Jurgonski and tax work was the responsibility of John Fredlake. The day to day intercourse with Carolyn who was in charge of the company's books and records was Gregory Jurgonski and/or Allison.

Because Henry-CAP was involved in bidding and performing construction work for public entities within its South Bend operating area Henry-CAP was required to make bids and sign contracts for public works with a surety company who would sign with Henry-CAP the bonds for bidding and for performance. Having a surety for building and performing projects was known as an essential requirement of any successful construction company that public works projects be a substantial part of its business and contribute substantially to the proceeds and annual gross revenue of the company. Henry-CAP would be prohibited from participating in public works projects without the ability to post a bid and a performance bond with surety. In turn a surety would not participate and underwrite the surety bond without having company financial statements reviewed and certified by a respected certified public accountant.

Both Daniel and Carolyn understood and agreed that they were forming a business enterprise with each other knowing each was to offer their full time, skills, talents and training for the sole benefit of Henry-CAP and that they would be paid weekly salaried. As owners of the company they would be paid monies from the profitable operations of the company after all

3

expenses were paid as the sole source of income for their personal and family financial use and support instead.

The company under the guidance of Carolyn and Daniel was very successful and in the year 2007 had gross receipts in excess of ten million dollars ($10,000,000). This gross income generated substantial income for the payment of themselves as owners.

In about 2003 Carolyn became aware that both Daniel and Jean were using the company credit cards to pay for personal expenses, to take vacations, to pay insurance on vehicles, gasoline, gifts and restaurants. Then when their sons became old enough the cards were used to pay the boys expenses at school and gasoline. Carolyn did not agree to this arrangement.

During this time, because the amounts became such a serious issue for the company's cash flow and the funds were not being equally shared. Carolyn contacted the accountants and asked what should be done. She was advised that this was not proper use of company credit cards and that the CPA partner would have a conversation with Daniel. In addition Carolyn was told by the accountants that there had to be an allocation of the monies spent for personal use by Daniel and Jean and that it must be shown on the yearend financial statements of the company as monies taken for personal use and identified a "shareholder loans." Because of their "review" of accounting practices and procedures, the accountants required the personal use of company funds and income be shown on the review financial statements. Copies were given to surety companies with the explanation and disclosure of the personal use of funds the Henrys had withdrawn. The banks and surety companies were now cautious of lending to Henry-CAP

In her testimony Jean admitted she was using company cards for personal use and further stated that Daniel had always used his credit card for personal uses even when working for other companies and that she participated.

4

In 2007 the CPA firm of Jurgonski and Fredlake refused to do any further accounting work or provide review services as part of the financial statements. However, at specific requests it would continue to prepare annual tax returns. As a result the sureties and banks stopped signing as surety on bid and performance jobs. As a large construction company doing public works projects its operations imploded.

Gregory Jurgonski and Allison Swinehart from the accounting firm of Jurgonski and Fredlake both appeared and testified that the financial work and accounting performed by Carolyn was adequate and satisfactory and that they believed she was competent in her work.

On the 27th day of September 2005 the birth of Carolyn's son occurred. Although she was not in the office all the time she was able to manage the work which she oversaw through the use of her personal computer and communicated by telephone with employees and was able to perform the work under her responsibility and supervision. In the beginning of October 2007 Carolyn returned to work full time although from time to time she would take off a day to care for her son. Carolyn's mother-in-law watched her son at times.

On about the 28th day of August 2008 while she was working late at the office Daniel approached her and told her that she was no longer needed and should gather up her things and leave. Daniel said that he had another person who was a CPA coming in to do her work. Pursuant to the tone and the lateness of the day Carolyn gathered her things including her computer and went home. The next few days she did her work from her home and did not talk to Daniel although he called from time to time. She then learned after one (1) week to ten (10) days later that the new CPA employed to take her position left the company.

5

Daniel did not pay or offer to pay Carolyn her fair value of the shares of the company of two hundred and fifty thousand dollars ($250,000) nor her investment of $33,000 nor did he offer to pay any compensation to her as an owner of the company.

After a few months Carolyn learned that the company was shrinking in size and in activity.

Carolyn also learned that Daniel had formed with the help of Attorney Johnson a new company called Henry-Enterprises LLC and had been doing private work through that company.

Carolyn also learned that because Henry-CAP could not meet the bonding requirements for doing public work projects that the major operating area of the company was evaporating.

During this time in the summer of 2008 Carolyn learned that Daniel had purchase real estate in his own name and that Henry-CAP was paying as rent presumably for the use of the premises enabling him to make the loan principal payments. This property was conveyed to Daniel's father's estate before bankruptcy was filed.

In December of 2011 Daniel Henry filed personal bankruptcy.

In 2008 Carolyn filed a law suit against Daniel and Henry-CAP alleging that Daniel had breached his fiduciary duty as a shareholder and director of Henry-CAP and engaged in a "freeze out" of Carolyn requesting damages and reimbursement of Attorney's fees. This freeze-out of Carolyn constitutes fraud under Indiana law. This litigation was filed in the South Bend Superior Court as Cause No.: 71C01-0812-PL-00280. The parties had engaged in extensive discovery during the next couple of years in which depositions were taken, interrogatories and request for production of documents were exchanged. In early November of 2011 Carolyn's Attorneys obtained from the State Court an Order of Court requiring Daniel to answer interrogatories by a day certain in December of 2011.

Concurrently with that response date Attorney Johnson on behalf of Daniel filed his bankruptcy. This litigation in South Bend is now pending.

This Statement of Material Facts are included for the ease and use of the Court.

Comparisons of the facts indicate little conflict between the parties' views. It is obvious under Indiana law neither Carolyn, Daniel nor Jean were employees at will. However, Daniel and Jean as members of the Board of Directors and as majority shareholders had a fiduciary duty to Carolyn to fairly and justly treat her as a minority shareholder and that Henry-CAP as a closely held business organization created as a corporation is classified under Indiana law as a hybrid partnership. As such, Carolyn as a minority shareholder is entitled to the protection of the law for the damages caused by the breach of the fiduciary duty by Daniel and Jean.

Daniel argues to the Court that Carolyn is responsible for all his troubles and for that he ordered her to leave the premises.

As was testified by CPA Gregory Jurgonski, his firm ceased doing accounting work in the preparation of the review statements for Henry-CAP because of the continuing personal use of corporate funds by Daniel. Mr. Jurgonski said that he was required by accounting rules to show Daniel and Jean's use of corporate funds for personal expenses as "shareholder loans" on the review statements. Even after the accountant had a discussion with him about the consequences, Daniel and his wife Jean refused to stop taking corporate funds to pay their personal expenses. Mr. Jurgonski testified that once the banks and insurance companies saw the financial review statement with the "shareholder's loans", they stopped lending and underwriting surety bonds for bid and performance bonds for public work projects on behalf of Henry-CAP. Yes, Carolyn brought to light Daniel's refusal to stop taking corporate funds for the personal expenses. Henry-CAP could not get a surety bond for construction and public projects.

Following expected and acceptable financial practices in a company is expected by third parties including Henry-CAP's employee unions. The cause for Henry-CAP's ultimate failure was not Carolyn's reporting unauthorized use of corporate funds but Daniel's refusal to stop the practices. During the following years from 2009 to 2011 the operation of Henry-CAP imploded.

Daniel and Jean should not be permitted to place the burden on Carolyn for financial loss of not only her investment but of her one third (1/3) value of the company. If the Court does not hold the Henrys personally responsible for their bad actions this clearly would be a breach of the spirit if not the specific requirements of the provisions of the Bankruptcy Act by permitting their discharge. Many people would benefit from rejecting discharge including Carolyn. Then only Henry would be burdened with the payment or the future resolution of his obligations to third parties. Carolyn clearly demonstrated the fraud of the Henrys to her and the corporation. A denial of discharge to the Henrys would give Carolyn as well as parties not party to these proceedings the opportunity to determine the financial worth of the Henrys by seeking out assets which had been transferred before Bankruptcy and to bring these assets before the Court to determine if payment would be a fair and equitable remedy in a state Proceedings Supplemental to Execution on the judgment.

Daniel with his wife Jean benefitted from their improper business practices of using corporate funds for their personal expense. They should be the ones who suffer. Therefore it is again requested that the Court deny discharge to the Henrys.

**WHEREFORE,** Plaintiff Prays that the debtor/Defendant's debt owed to the Plaintiffs be declared as non-dischargeable and grant relief of stay to the Plaintiff, and for all other relief to which Plaintiff may be entitled.

8

Case 13-03061-reg    Doc 51    Filed 04/07/15    Page 8 of 9

Respectfully Submitted,

GORDON A. ETZLER & ASSOCIATES, LLP
Attorney for Plaintiff

By: /s/ Gordon A. Etzler_____
Gordon A. Etzler 6743-64
251 Indiana Ave.
Valparaiso, IN 46383
Phone: 219-531-7787
Fax: 219-531-4732
E-Mail: GAE@Etzlerlaw.com

**CERTIFICATE OF SERVICE**

    I certify that on the 7th day of April, 2015, service of a true and complete copy of the above foregoing pleading or paper was made upon each party or attorney of record herein by hand delivery and/or depositing the same in the United States Mail/Courthouse mail in envelopes properly addressed to each of them and with sufficient first class postage affixed.

COUNSEL FOR DEFENDANT HENRYS

    I further hereby certify that the foregoing document complies with the requirements of Trial Rule 5 (G) with regard to information excluded from the public record under Administrative Rule 9(G).